Mr. Bolling I think we can dispense with reading the entire list and if you just call the first case for argument we'll proceed that way. First case for argument this afternoon is number 15-3889 North Dakota United States v. Randy Skarda. Very well Mr. Chapman we'll hear from you. May it please the court. Yes sir. My name is Kevin Chapman I represent Randy Skarda the appellant in this matter. Agent Coulter was clearly wrong in the actions that he took on October 7th of 2013. Agent Coulter has a sworn affidavit that he filled out after interviewing an informant with respect to alleged purchase and delivery of methamphetamines. After a lengthy interview with this informant he swore out the affidavit and he determined that the address for the warrant was 10952 Keene, North Dakota. That was his determination that he made. Based upon that particularized probable cause or alleged probable cause within that informant's testimony he obtained a warrant with that specific address on it. Later that evening when he and other law enforcement officials gathered in McKenzie County to work out a plan to execute on the warrant it was an officer that had nothing at all to do with that earlier affidavit and interview of the informant. That officer Mr. Johansson with nothing else he didn't have anything to do with it he says well but Mr. Skarda's is a different address it's 10841. But Mr. Johansson having had nothing to do with the earlier interviews and not not having the benefit of what the informant was saying had had no reason to think that the particularized probable cause would have to do with this 10841 address. So then what how did the original officer come up with the 10952? Agent Coulter your honor originally came up with that address by calling the North Dakota Department of Transportation and asking what addresses yeah they had. So the government says well it didn't come from the informant it came through the kind of records check that you're describing so why does it matter whether Johansson had spoken to the informant if he was just correcting what Coulter had done through the records checking? Because your honor we don't know what the informant had intended because she had indicated that she believed it was Randy Skarda's address or their homestead. And so there was multiple assumptions well started to pile up. Didn't the informant say that it was that she was buying the methamphetamine at his residence and that it could be owned by the parents? Her words could be interpreted as your honor interpreted them. When I see that affidavit filled out by Mr. Coulter I don't believe that the informant Ms. Starr actually said it's where Randy lives, Mr. Skarda lives. I don't believe she said that. So that's another hole in the entire analysis because so they get to this area where they're they're talking about going in on this warrant. Mr. Johansson says well but that's not where Mr. Skarda lives. And so agent Coulter's assumption at that point in time is without any factual basis is that oh well I must have the wrong address on the warrant. He takes that illogical leap. So then what happens... Well didn't didn't he also go to Google Earth and see that the descriptions sort of matched? The description given by the informant was a single-family dwelling with a large quonset in a farmstead in North Dakota. And she did mention something about some construction going on. Well both the 10952 address which was Mr. Skarda's parents and the 10841 address which was Mr. Skarda's, they're both single-family dwellings and they both have farm type quonsets located on the property. Well the warrant was the warrant was focused on Mr. Skarda's at home wasn't it? Well but your honor we don't we don't know that. And that's one of the problems because what agent Coulter should have done when this huge question arose as you know they're anxious the law enforcement they want to get this thing done although there's no exigent circumstances and none have been alleged. They want to get this warrant executed. And so we have all these assumptions that start mounting up mounting up and so Mr. Coulter indicated during the suppression hearing at some point that at that point in time he did look at Google Earth. This is after the first warrant was issued and he sent FBI agent Bennett and then he called the magistrate judge Karen Klein. And what the evidence showed at the suppression hearing was that agent Coulter had already called magistrate Klein and we don't know what was said to magistrate Klein because there's no recording of it which is another violation to be seen in the totality of these circumstances. But the undisputed evidence is that when FBI agent Bennett returned from the journey to check these at this address out, agent Coulter was already on the phone with the magistrate. So any argument by this the United States that agent Coulter had provided is any kind of a sufficient nexus to transfer the warrant from the 10-952 address to the 10-841 address is incorrect because that call had already been made and again we don't know exactly what was said during this brief conversation between magistrate Klein and Mr. Bennett because it's not recorded. But what agent Coulter should have done is contacted perhaps the informant and said ma'am we have a issue here. I'd like you to identify in more detail for me what place you were actually talking about. And if it would have taken the next day to do it, then it takes the next day to do it. Our Fourth Amendment rights are more important with the expediency of law enforcement in executing a warrant. But the other thing that's interesting in the totality of circumstances is there could have been any address given by the North Dakota Department of Transportation. It could have been an old college address. So the chance of this warrant going to a wrong place was enormous. The agent Coulter should be punished. Law enforcement should be punished because of this illegal search. It was agent Coulter that called Magistrate Klein and represented to her whatever it is that he represented to her, we don't really know what it was, and got the permission from Magistrate Klein to change the address on that warrant and to mark her initials on it. That is conduct that should not have occurred that evening. That's why the good faith exception does not apply in this case. The Eighth Circuit test to determine the sufficiency of the description to be searched is whether the place to be searched is described with sufficient particularity to enable an executing officer to locate and identify the premises with reasonable effort. What we have here is the family house with the Quonset farm place in North Dakota. That could cover 99% of the farm places in North Dakota. What agent Coulter should have done when he's with the informant is get actual directions to what is she talking about, where is she saying she went and allegedly bought methamphetamine. That should have been pinpointed at the very get-go on this warrant, but it was not. Instead, he calls DOT to get an address, and the address looks like a rural address in Keene, North Dakota, slaps it on the warrant, and then later on that night, all of these assumptions start piling up, start rolling in, and all the Fourth Amendment rights against an unreasonable search. The second part of the test is whether there's a reasonable probability that another place might be mistakenly searched. We definitely have that here. If you take out Officer Johansson from that equation on the night of October 7th, they go to the 10952 place. They go to the 10952 place because that was a place on the list. As to the good-faith exception test, if the issuing magistrate was misled by information in an affidavit that the affidavit knew was false or would have known was false except for his reckless disregard for the truth, that would be one reason why the good-faith exception would not apply. The reason why I'm arguing that the good-faith exception does not and apply is because of the actions of Agent Coulter. He's the one that interviewed the informant. He's the one that elected to get the address from the DOT. He's the one that elected not to pinpoint with the informant, where on this map, ma'am, are you saying that you went? That's all that he would have had to do and had actually gotten an address. But then for Agent Coulter, that night, to be in such a rush when there's no exigent circumstances at issue and to start assuming things was clearly wrong. Couldn't it be argued that he did the right thing here in the sense that when he got additional information that pointed to the what turned out to be the correct address, he made an effort to correct it? He did make an effort to correct it, Your Honor, but the methods and form that he used to try to correct it was wrong. Because what he did is he just gets on the phone with the magistrate at 6 o'clock p.m. and I could only assume that he allegedly just told her, hey, I've But the issue is whether there was sufficient probable cause and particularity with respect to the 10-841. They're just assuming that they're transferable, that they're interchangeable, and my argument has been that they're not. And it was wrong for Agent Coulter to tell Magistrate Cline that it was just a mistake. And remember, he had already done that before FBI Agent Bennett and Johansson had returned from a site. Because I think they went there to see if the site could fit into the description given by the informant. The problem there is that description given by the informant covers 99% of farmsteads in North Dakota. Single-family dwelling with a large Quonset. Are you saying that there's that many Quonset huts in the farming area of North Dakota? That's our argument, Your Honor, because the the Google Maps indicate as such. Because when you look at the Google Map of Mr. Skarda's parents' place, the 10952 place, it's a single family. It's got a address, Randy Skarda's place. Got a single-family house and a Quonset. Maybe that just ran in that family Quonset huts. Yeah, and throughout North Dakota, I would argue that if you go to any kind of a family farm type situation, you're going to see a Quonset restoring the machinery and a single-family house. I see, okay. And so to me that wasn't particular, to me that's not particularized. And do you care to save any time for a rebuttal? You're down to your last minute. I did save ten or five minutes for rebuttal, Your Honor. Well, you've already used four of it though, the way the clock works. Okay, that's correct. I didn't see the yellow. I would like to save the 40 seconds. Very good. We'll hear from Mr. Volk then. May it please the court, Mr. Chapman. I'd like to start off just kind of where Mr. Chapman left off. When one looks at the affidavit that was actually originally submitted in this case, the informant actually does talk about this is where Randy Skarda lives. That's, that's, it says star indicated Skarda resides near Keene. Skarda described the property as possibly being Skarda's parents identified homestead and then goes on to describe the home. Significantly, the home that she describes is under construction. The actual, the physical home. And she talks about the construction that's actually going on at the home. Now when Agent Coulter obtains the address in this case, it's simply from the DOT records. That's when the original warrant is issued. When he and the others meet beforehand, before actually going out to execute the warrant, Deputy Johanson is there. Significantly, and what Agent Coulter talked about at the, or testified to at the suppression hearing, is that Deputy Johanson knew this property well and he knew it because he lives in that area. So he knew exactly where Mr. Skarda resided. The probable cause that the magistrate judge originally found wasn't particularized as to the 10952 address that was just a DOT record. The probable cause was particularized as to where Randy Skarda lived. And in this case, it was clear at the time of the briefing before the execution of the search warrant, where Randy Skarda lived. And that was based on what Deputy Johanson had told Agent Coulter. And he did the correct thing. He didn't execute the warrant as it had been written. He contacted the magistrate judge. Was the warrant written for Randy Skarda's residence or where he lived? Was that? It was written. It did spell out the warrant should be executed at the 10952 residence. So when the local officer looked at it and said Randy Skarda's residence, and he says that's not where he lives. That's what happened, right? That's correct. Did the warrant say Randy Skarda's residence, which is 10291? Was that the original language? I believe it says, I may look. Where are you looking? What page? I'm trying to find, to see if we have the actual warrant that's in our, the application. I'm looking at the government's appendix. Would be A17, and it just simply says the premises located at 10952. It does not say Randy Skarda's residence. It just says the premises located at. But again, that's developed simply from the records from DOT, but the probable cause description that's provided not only by the informant, Ms. Starr, but by the second informant as well. Did the warrants mentions Randy Skarda? Yeah. Or just the residence? It mentions the premises located at that specified address. With the affidavit. With no name? No name. The affidavit of course mentioned Mr. Skarda and his residence, and the informant never specifically said he lives at 10952. She did not provide a numeric residence. She provided, or numeric address, I'm sorry. She provided a physical description of where he lives. What about the statement though that the parents may have owned the place where he was residing? He's talking, the informant is talking about a homestead, and there's multiple families who move off of their homestead into town, to a homestead is not necessarily a residence. The affidavit never said this is where Mr. Skarda's parents currently reside. It says that this was possibly the parents homestead. Well that's totally different. It's not the same as saying that's where they reside. Well did the records that Johansson searched, or did he search any records, or did he just do it based on where he knew Johansson lived? That Skarda lived. Yes, Johansson didn't need, well he didn't, he did gather a numeric address from his dispatch. That's all the 10841 residents. He didn't know the numeric residence number off the top of his head. But he didn't check, did he check whether that was the parents homestead? I don't know that there's anything in the record that says that, Judge Colleton. Okay, but the first number was the parents homestead? I believe based on the information, well it's where the parents live. I believe the 10952 is where his parents live based upon the information that was submitted by Mr. Chapman and his suppression. So does that mean it was their homestead? No, I believe that means that's where they currently live, Judge. I would argue that a homestead is completely different. My wife's parents homestead is near Hillsborough, North Dakota. That's why I'm asking whether the first address was the one way or the other. Are you talking about the 10952? Yes. I don't know that the record reflects that. I know the record reflects, based on the motion that was brought by Mr. Chapman, that that's where they live. It doesn't say whether it's their homestead or it is not. Well, the word homestead has a couple of different meanings. One is that under the Kincaid Act, you could occupy 160 acres and that was your homestead, and if you did what the law required, then you owned it. But homestead is also used in different ways in the law, which doesn't necessarily reflect that it was somebody's homestead under the Kincaid Act. We're talking about an informant, a person who's involved in this who knows Mr. Skarda. She referred to it as a homestead. I'm sure she didn't refer to it in a legal sense. Yes, I see. So that probably is where they lived. Had lived at some point in time, and I think that's the common understanding of the term, especially when she talks about Mr. Skarda now residing there. In rural areas, that would probably be correct. Sure. Well, if that's the natural understanding of it, then why doesn't that suggest 952 was the correct, was the address that matched what the informant was describing? If the informant was describing the parent's homestead and the natural meaning is where the parents live. No, I think maybe you misunderstood what I was talking about. She's not talking about that's where the parents live. She's talking about where Mr. Skarda lives, being their homestead. Maybe I'm not being clear. Well, I thought you just had this colloquy with Judge Beam about how the ordinary meaning of homestead when you're talking to an informant is not the Kincaid Act meaning, but probably where the people live. It was referred to as the parent's homestead, not Skarda's homestead. All right. Well, maybe I wasn't understanding what Judge Beam was saying. What I see, a homestead, I look at it as, and I think the informant here was looking at it, as a former location where Mr. and Mrs. Skarda, Randy Skarda's parents, lived at one time and have now moved. Or just property they own. Or just property they own. Randy probably lived where the parents' homestead existed and they were living someplace else which wasn't their Kincaid Act homestead. Is that what you're saying? Yes, Judge. And I'm sorry I confused that. All right. Did Agent Coulter testify as to what he told the magistrate on the phone? I believe he did testify that he told her that he had an erroneous address, that he had indicated that he obtained the address and the information from the deputy, from Deputy Johansson, who lives in the area. So that's what his testimony was. He also did testify, however, that he had looked at Google Maps and viewed the property, that he had sent another FBI agent and Deputy Johansson to look at the property in particular as well. I don't know that the record is clear that that happened. He's on the phone with the judge while this is going on. And so it's unclear whether that was communicated or not as far as the Google Earth and the viewing of the property itself. So it's unclear whether that was communicated to the magistrate, Judge? Yes, I think that's unclear. One of the cases I want to make sure that the court, when you consider that particular nexus, is to look at the Talese case, T-E-L-L-E-Z. It's 217 Fed 3rd 547. One of the things that that case, which is an Eighth Circuit case, talks about is that when you have evidence that a defendant is engaged in a continuing course of criminal activity, that allows for a supply of drugs or perhaps other evidence related to his drug dealing in his home, in his residence. When you look at the affidavit here, it's very clear that both the informant, Ms. Starr, had talked about a continuing course of conduct. She had recently received methamphetamine from Mr. Skarda, but she talked about receiving methamphetamine every three to four days over a course of the past year. There was also a second informant, who's referred to as CS-5 in the affidavit, who talks about also obtaining methamphetamine not only from Ms. Starr, the informant, but also from Mr. Skarda. And again, refers back to his residence as having gone there and obtained methamphetamine from Mr. Skarda at the residence as well. So we're talking certainly about a continuous course of criminal activity. This court, in that case in particular and others, says when that type of activity occurs, there is a reasonable inference that can be drawn that the subject of that trafficking would have either a supply of drugs or some other records or indicia of his or her drug trafficking activity at one's residence. We did establish that probable cause connection or nexus with Randy Skarda's residence. When that was corrected as to where he lived through the contact, the second contact with the magistrate, that nexus goes to that new address, 10-841. It's Mr. Chapman's contention that you should have searched the elder Chapman's residence under the documents that you had and you wouldn't have found any methamphetamine there, is that right? Isn't that what his argument is? That's his argument. I believe that he's suggesting that they should have searched that residence. Well, that's what the original warrant said, yes. Would they have found methamphetamine? The warrant was looking for more than just methamphetamine in and of itself. It was also looking for any records, documents, indicia of drug trafficking. It wasn't specifically, we're just looking for methamphetamine. Whether they would have found methamphetamine there, I don't know. It was never executed. Would they have found other indicia of trafficking? Possibly, they may have. I just wanted to point out, I see I only have one minute left with reference to the procedural violation here. I believe that the evidence here shows that Agent Coulter did exactly what this court would have an agent, a law enforcement agent, do when presented with this particular circumstance. Finding out that the address is different. He did contact the judge. It's the judge's responsibility then to put him on hold and get a record. I don't say that just because I feel that way. It's actually written in the rule. Rule 41 actually does place the obligation on the judge, not on the agent. What time of day did he contact the judge, do you recall? I believe it was after 5. It was between 5 and 7 p.m. It is in the record. What would the judge do just as a practical matter, in your experience? If it's after hours and the judge would typically have his or her clerk record it with a tape recorder connected up to the phone, has been my experience. The unfortunate part here is, as you look at the record, is that the magistrate here was not in the courthouse and was outside and had to be connected via her staff. Right, so then in that situation it's more difficult to comply with the rule. I guess you're saying maybe there should have been a conference call arranged or something with the home office where the home office could record it? Yes, judge. I think that would be an option at least. It would have been an option, yes. All right, well thank you for your argument. Mr. Chapman, we'll give you one minute in rebuttal if you could set the clock. Mr. Bolling, thank you. Thank you, Your Honor. What the magistrate, I would argue what the magistrate should have done was say, are there exigent circumstances, Mr. Coulter? Mr. Coulter, as he admitted in the suppression hearing, said there was not exigent circumstances. And then they could have sworn out a new affidavit, went back to the informant and found out, because there's all this confusion and multiple assumptions piling on, they should have found out directly from the informant, what address, ma'am, are you talking about? But now you're arguing mistake by the magistrate judge, really? You're arguing now mistake by the magistrate judge, which gets you into good-faith exception. The agent called and the judge was at least under Leon, even if you're right about what the judge should have done. Well, I still cast blame on Agent Coulter primarily, Your Honor. I see that my time is up. Okay, well I think we understand your argument and the case is submitted. We'll file an opinion in due course.